IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

| | | |
|---|---|---|
| Timothy L. Wright, | ) | |
| | ) | C/A No. 5:17-3292-TMC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Lieutenant Alfred Grant, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Timothy L. Wright ("Wright"), a state prisoner proceeding pro se, filed this action pursuant to 42 U.S.C. § 1983, alleging a claim of excessive force against Defendant Lieutenant Alfred Grant. Defendant filed a motion for summary judgment (ECF No. 75), and Wright filed a response opposing the motion (ECF No. 80). On April 9, 2019, Magistrate Judge Kaymani D. West issued a Report and Recommendation ("Report") recommending that the Defendant's Motion for Summary Judgment (ECF No. 75) be granted. (ECF No. 83).[1] Plaintiff timely filed objections to the Report. (ECF No. 85).

The Report has no presumptive weight and the responsibility to make a final determination in this matter remains with this court. *See Mathews v. Weber*, 423 U.S. 261, 270-71 (1976). In the absence of objections, this court is not required to provide an explanation for adopting the Report. *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983). Rather, "in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ.

---

[1] In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02(B)(2), D.S.C., all pre-trial proceedings were referred to a magistrate judge.

P. 72 advisory committee's note). Furthermore, failure to file specific written objections to the Report results in a party's waiver of the right to appeal the district court's judgment based upon that recommendation. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

## I. Facts

This action stems from incidents that occurred on November 22, 2016. On that day, Wright was housed in the restricted housing unit ("RHU") at Lieber Correctional Institution where he shared a cell with Jonathan Arnold ("Arnold"). (ECF No. 1 at 3-4). It is undisputed that Defendants and several other officers deployed MK-4 chemical munitions into their cell. (ECF Nos. 1 at 4; 75-1 at 2). However, Wright and Defendant's accounts of what lead up to the use of the chemical munitions and what happened afterwards are quite different.

Wright contends that Defendant approached Wright and Arnold's cell door and asked which one of them had thrown urine on Maintenance Supervisor Crouch. (ECF No. 1 at 4). Wright alleges that Arnold admitted to Defendant that he had thrown the urine at Officer Couch, and that Defendant told them that they would not be getting a haircut or shave. (ECF Nos. 1 at 4; 85 at 2). Wright contends that he asked Defendant why he was being punished when Arnold had admitted to throwing the urine, and Wright had nothing to do with it. (ECF Nos. 1 at 4; 80 at 6; 85 at 2). Wright alleges that Arnold asked Defendant to get a supervisor, and Defendant refused. (ECF Nos. 1 at 4; 85 at 2). Wright alleges that he stepped away from the cell door and Arnold began speaking with Defendant, and, without any demands, directives, or warnings, Defendant sprayed 77 grams of chemical munitions at point blank range into the cell. (ECF Nos. 1 at 4; 85 at 3) He states that he put his face into the toilet trying to wash the gas off his face and out of his eyes. (ECF Nos. 1 at 5; 85 at 3). Plaintiff contends that he was in no condition after being maced

2

to help Arnold. He alleges that Defendant then tried to close the door flap, but when he could not, he left the wing. (ECF Nos. 1 at 5; 85 at 3).

Wright alleges when Defendant returned twenty minutes later, Defendant and other officers began spraying chemical munitions into Wright's cell through the flap and under the door. *Id.* Wright states that he got inside his mattress in an effort to escape the gas. *Id.* An hour later, Wright alleges that Captain Jordan Williams called him by name from the cell door and spoke with him. *Id.* Being unable to resolve any issues, Williams left and returned about ten minutes later with Warden Joseph McFadden. *Id.* Warden McFadden took Wright and Arnold to a holding cell and spoke with them. (ECF Nos. 1 at 5; 85 at 4). Warden McFadden then told Defendant to take Wright and Arnold back to their cell and give them cleaning supplies. (ECF Nos. 1 at 6; 85 at 4). Wright alleges that their cell had been stripped while they had been talking with the Warden and, that once Wright and Arnold were back in their cell, Defendant sprayed them again with gas while they were handcuffed. *Id.* Wright contends that Defendant then turned off the water to his cell. *Id.* Wright alleges that he has suffered injuries to his right eye, psychological trauma, and mental anguish. (ECF No. 1 at 6).

Defendant contends that four separate incidents occurred on November 22, 2016: (1) the early morning macing incident which Wright refers to in his compliant; (2) an incident at approximately 10:30 a.m. where Wright and/or Arnold threw urine (referred to as "dashing") on Maintenance Supervisor Crouch; (3) an incident at approximately 3:00 p.m. much like the early morning incident where Wright and Arnold barricaded their cell door and, after refusing to follow directives, were maced; and (4) an incident which led to a charge of threatening to inflict harm based upon a Request to Staff form sent from Wright a few days earlier which Warden McFadden received at approximately 4:00 p.m. (ECF No. 75-1 at 4-5). Defendant acknowledges that Wright

3

alleges that the dashing incident occurred first, but Defendant argues that "the sequence of these events is not material to the summary judgment determination as [his use of] force was justified either way." *Id.*

Crouch's incident report, the disciplinary report, and hearing record state that the dashing incident occurred at 10:30 a.m. on November 22, 2016. (ECF Nos. 75-9; 75-10). Officer Warren Streety's Incident Report for the early morning incident states it occurred at approximately 8:15 a.m. on November 22, 2016, and that he used 23 grams of mace. (ECF Nos. 75-7). Defendants' incident report states this incident occurred at approximately 7:20 a.m. on November 22, 2016, and that he used 55 grams of mace. (ECF No. 75-6). Officer Cline Williams's incident report states that a gassing incident occurred at 3:00 p.m. on November 22, 2016, and that he used 43 grams of mace. (ECF No. 75-11). Further, Williams' incident report states that Defendant and Officers Silva, Streety, Rockefeller, and Johnson were all involved in this afternoon incident. *Id.* However, there are no incident reports in the record from these other officers regarding an incident that afternoon.

In regard to the early morning incident, Defendant alleges that Wright and Arnold were using a sheet to keep the window flap on their cell door open, which Defendant states must be kept closed to ensure the safety of the RHU officers. (ECF No. 75-1 at 2). Defendant contends that Wright and Arnold failed to comply with directives to remove the sheet from the window, and they were pushing and hitting Officer Rockefeller's riot shield. *Id.* Therefore, Defendant states that he administered a burst of MK-4 chemical munitions into the cell. *Id.* at 3. He alleges that he administered a second burst because Wright and Arnold still refused to follow directives and pushed on the riot shield. *Id.* Defendant contends that, because Wright and Arnold continued to push on the riot shield and refused to remove the sheet, Officer Streety administered a third burst

4

of the MK-4 chemical munitions. *Id.* Officer Streety was eventually able to removed he sheet and close the flap. *Id.* Defendant then states that a nurse assessed Wright and Arnold and observed both inmates walking and talking and not showing any signs of respiratory distress. *Id.* Defendant alleges Wright and Arnold had access to water in their cell. *Id.*

As set forth in the Report, Defendant has filed two videos depicting some of the early morning events:

> The first video, Exhibit S-Video 1, is seven minutes and eleven seconds long, and it depicts the following:
>
> Defendant appears standing in front of the camera. He identifies himself as Lt. Alfred Grant, of the R.H.U. Unit. He states that it is November 22, 2016, at 8:05 am. He is wearing a helmet with a face guard that is not covering his face. He is also wearing a black uniform with "SCDC" written across a protective vest. He then states that Plaintiff and Inmate Jonathan Arnold have refused to close their flaps because they have been "barricaded" or "tied" off. He states that he and his team are going to secure the flaps and that he will give the inmates one directive to un-barricade the flap, and he and his fellow officers will then proceed to close the flap. Defendant and Officers Streety, Silva, and Rockefeller, see ECF No.75-4 at 1, ¶ 4, then walk to Plaintiff's cell.
>
> Once they arrive at the cell, Defendant twice asks the inmates, in a normal volume and tone, to "unbarricade the flaps for me." The inmates do not comply with Defendant's directive. Almost immediately another officer says "gas' em, gas' em, gas' em." The officers then place and struggle to keep a protective shield over the window flap.
>
> Defendant attempts to remove a grey sheet with a thick knot that appears to be holding the window flap open. Defendant then sprays a burst of gas through the left side of the open window flap. One of the officers can then be seen and heard coughing as he struggles to keep the shield over the open window. Defendant then sprays a second burst of gas through the left side of the open flap.
>
> An officer can then be seen leaning against the cell door and coughing while he seems to be attempting to keep the protective shield over the window closed. As he leans against the shield and cell door, a white object quickly jabs through the upper left corner of the shield. As this is happening, Defendant is standing behind the officer who is leaning against the door. The white object appears again quickly in the direction of the upper-left side of the cell door.

5

The inmates continue to push against the shield covering the window flap and Defendant and his colleague labor to keep it pressed against the opening. While assisting his colleague to hold the shield over the window, Defendant uses his left hand to spray two more bursts of gas into the cell. Then a liquid can be heard falling onto the floor while an officer coughs and gags. Other individuals can be heard talking loudly in the background.

Defendant then says, "come off the flap." He repeats the order twice. Defendant then uses his baton to rap on the window eight times, and he repeats the directive to "come off that flap." He continues to slowly beat on the window while ordering the inmates inside to "come off that flap." He then asks a fellow officer to tell "Streety to come [move or get] the gas." The Officer answers that Streety is getting a suicide knife to start cutting the sheet. Meanwhile, Defendant and his fellow Officers continue to struggle to hold the window closed. They then start banging on the window, and as they are doing so another officer approaches. Defendant then asks that officer, who appears to be Streety, to use the gas. He gives this directive [to Streety] three or four times. Streety then sprays a burst of gas into the cell. He then begins to pull on the sheet. Defendant appears to ask Streety to spray another burst of gas. Streety does so. There is more coughing while Streety resumes pulling on the sheet. More banging can be heard, but it appears to be coming from elsewhere. Once it seems that the officers have removed the sheet, the officers are then able to close and secure the window to the cell. The officers back away from the door while Defendant says that he will call someone.

ECF No. 75-20 at 1; Exhibit S-Video1.

The second video is one minute and nineteen seconds long and depicts the following:

Defendant appears in front of the camera and states his name and introduces an individual identified as Nurse De Leon. He then states that the two of them are going to check on Plaintiff and Jonathan Arnold because they had just been gassed. Once they approach the cell door, Defendant directs the inmates to "back up from the flap." Nurse De Leon then calls for Mr. Arnold and asks if he is ok. She then asks, "is that Arnold?" and she announces herself again. Defendant then pulls her protective facemask down over her face. She then calls for Mr. Wright. Soon thereafter, she says what sounds like "They both look like they are walking around, so . . ." Defendant and Nurse De Leon then turn to the camera. Defendant states that "[t]hey've been checked by the nurse. The nurse said they are both in there walking around and talking." Nurse De Leon then says that "Inmate Wright and Inmate Arnold are standing, walking, talking" and it seems that she finishes by saying that there is no appearance of respiratory distress. The video then ends.

ECF No. 75-21 at 1; Exhibit T-Video 2.

6

(ECF No. 83 at 3-5).

## II. Legal Standard

Summary judgment is appropriate if, after reviewing the entire record in a case, the court is satisfied that no genuine issues of material fact exist and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Issues of fact are material only if establishment of such facts might affect the outcome of the lawsuit under the governing substantive law. *Id.*

## III. Discussion

In his complaint, Wright alleges a claim of excessive force against Defendant. (ECF No. 1). Defendants filed a motion for summary judgment alleging that the video shows that Wright was a recalcitrant inmate refusing to comply with directives and that force was necessary to compel obedience. (ECF No. 75-1 at 9). Further, Defendant contends that he is entitled to qualified immunity. *Id.* at 13. In response, Wright alleges that he was not refusing Defendant's orders, Defendant did not give a directive until after he had used the chemical munitions, Defendant was retaliating for the prior dashing incident, and Defendant shut the water off in his cell. (ECF Nos. 80 at 11; 80-3 at 4). Further, he argues Defendant is not entitled to qualified immunity. (ECF No. 80 at 12). The magistrate judge recommends that the court grant Defendant summary judgment. (ECF No. 83). She determined that Defendant was not acting out of malice, but rather was acting in a good faith effort to get Wright to comply with orders and close the flap. *Id.* at 12. Further, she recommends that Defendant be granted qualified immunity. *Id.* at 15-16. Plaintiff has filed objections to the Report in which he alleges, inter alia, that the magistrate judge erred in determining that Defendant was not acting maliciously. (ECF No. 85 at 5).

The "unnecessary and wanton infliction of pain," constitutes cruel and unusual punishment forbidden by the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). Determination of whether the Eighth Amendment has been violated requires analysis of subjective and objective components. *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991). Specifically, when alleging an Eight Amendment claim for excessive force, the court must determine whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component). *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). What must be established with regard to each component "varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

In regard to an excessive force claim, to establish the subjective component, an inmate must show that the prison official acted "maliciously and sadistically for the very purpose of causing harm," rather than in a good-faith effort to maintain or restore discipline. *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). In making this determination, courts should consider: (1) the need for application of force; (2) the relationship between the need and the amount of force used; (3) the extent of the injury inflicted; and (4) the extent of the threat to the safety of staff and inmates as reasonably perceived by the responsible officials on the basis of the facts known to them. *Id.* at 321. The objective component measures the force used against "contemporary standards of decency." *Hudson*, 503 U.S. at 8 (internal quotations omitted). The objective component is not as demanding because "when prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. . . ." *Id.* (internal quotation marks omitted).

Because "[i]t is generally recognized that 'it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain,' " the Fourth Circuit "has closely scrutinized the use of tear gas or mace . . . in correctional facilities." *Williams*, 77 F.3d at 763 (quoting *Soto v. Dickey, 744 F.2d* 1260 at 1262, 1270) (7th Cir. 2009)); *see also Iko v. Shreve*, 535 F.3d 225, 239-40 (4th Cir. 2008) (finding use of pepper spray during cell extraction of nonconfrontational inmate constituted excessive force). In doing so, courts recognize that "even when properly used, such weapons 'possess inherently dangerous characteristics capable of causing serious and perhaps irreparable injury to the victim.'" *Williams*, 77 F.3d at 763 (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, "although it is not per se unconstitutional for guards to spray mace at prisoners confined in their cells, it is necessary to examine the 'totality of the circumstances, including the provocation, the amount of gas used, and the purposes for which the gas is used [to] determin[e] the validity of the use of tear gas in the prison environment.'" *Id.* (quoting *Bailey v. Turner*, 736 F.2d 963, 969 (4th Cir. 1984)).

Moreover, "even where an initial use of force does not by itself raise questions about a corrections officer's intent under *Whitley*, the continued application of force may give rise to an inference that force was used for malicious or punitive purposes." *Brooks v. Johnson*, ___ F.3d ___, 2019 WL 2063365, *6 (4th Cir. May 10, 2019) (citing *Iko*, 535 F.3d at 239-40, 240 n.11) (holding that although initial use of pepper spray to carry out cell extraction appeared warranted, four additional bursts of pepper spray - including one when inmate was lying on floor - gave rise to reasonable inference that force was applied maliciously).

Defendant relies heavily on the two videos that he has filed. (ECF Nos. 75-20; 75-21). The court has reviewed the videos and finds the magistrate judge's description set forth above to

9

be accurate. The videos, however, fail to provide an unobstructed view of the events, such as the inside of Wright's cell. While the video provides some reason to doubt the veracity of some aspects of Wright's account, it is not so "blatantly contradict[ory]" that the court may entirely disregard Wright's version of events for purposes of summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (holding that when a party's version of the facts is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion). Where the video obviously contradicts Wright's version of the facts, the court accepts the videos depiction instead of Wright's account. *Id.* But in many respects, the video is often not obviously contradictory because it fails to provide an unobstructed view of the events. Therefore, the court has credited Wright's version of the record evidence where no obviously contradictory video evidence is available.

While Defendant contends that he and the other officers maced Wright in a good faith effort to obtain compliance with their directives to close the door flap, Wright contends that Defendant was inflicting punishment for the earlier dashing incident. In the first video depicting the deployment of the chemical munitions, Wright is initially given very little time to comply with the directives. Moreover, even if the initial spray of chemical munitions was justified, the later ones were in quick succession and without any directives preceding them. *See Brooks*, 2019 WL 2063365, at *6. Further, the video does not show Wright's actions in the cell. Wright alleges he was inside his mattress and not fighting the officer's attempts to remove the sheet from the flap. Considering the facts in the light most favorable to Wright and drawing all reasonable inferences in his favor, a reasonable jury could agree with Wright and infer that Defendant's use of force was motivated, at least in part, by anger at the earlier dashing incident. Moreover, even if the jury were to find the initial application of force was proper, a reasonable jury could find that under *Whitley*

10

the continued application of force was used for malicious or punitive purposes. *See Brooks*, 2019 WL 2063365, *6.

Moreover, there is genuine issue of fact as to whether Wright was allowed to decontaminate himself after the macing. An inmate may maintain an Eighth Amendment claim of excessive force where he is subjected to chemical munitions and not allowed to wash or decontaminate himself. *Mann v. Failey*, 578 Fed. App'x 267, at * 5-6 (4th Cir. 2014); *see also Williams*, 77 F.3d at 768. In *Mann*, the Fourth Circuit held that summary judgment was precluded when the record demonstrated that officers refused to allow a prisoner who had been maced to decontaminate. *See Mann*, 578 Fed. App'x at 269-71.

Defendant denies shutting off water to Wright's cell. However, Wright alleges that the water was cut off to his cell and that he was not given any cleaning supplies. Clearly, these conflicting accounts preclude summary judgment. *See United State v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (stating that credibility determinations are for the trier of fact). The court finds that there exists a genuine issue of fact as to whether Wright was denied access to running water and/or cleaning supplies. Defendant also relies on the nurse's assessment depicted on the second video. In the second video, the prison nurse can be seen performing a visual exam of both Wright and his Arnold through the door while she remains outside the cell. She then states that Wright and his Arnold were walking and talking and did not appear to be in any respiratory distress. In *Mann*, the Fourth Circuit noted that "a lack of injury is not dispositive, so long as there is sufficient evidence of maliciously-applied force." *Mann*, 578 Fed. App'x at 274. Here, Wright asserts that the water was turned off after he was gassed, and he was not allowed to decontaminate. (ECF No. 80-3 at 4). Viewing the evidence in a light most favorable to Wright, Wright was sprayed with chemical munitions, and there is, at the very least, contradictory evidence regarding

whether he was allowed to rinse off the chemical munitions in his cell. Moreover, an issue remains as whether the nurse's assessment satisfies the obligation to allow an inmate to decontaminate himself after being sprayed with chemical munitions and obtain medical attention. *See Williams*, 77 F.3d at 765 (reversing summary judgment for the defendants and observing that "[a]lthough great deference should be afforded prison officials, it is difficult to conceive of a legitimate purpose for refusing to allow [a prisoner sprayed with mace] to wash and denying him medical attention . . ."). Even if a medical assessment by itself can be substituted for allowing an inmate to decontaminate himself, here, the nurse performed a very cursory exam - simply looking through the cell door for several seconds. And while Defendant has filed a video of her assessment, again the video does not depict the inside of the cell. It merely shows the nurse looking into the cell and stating that Wright and Arnold appeared to be standing, walking and talking and not in any respiratory distress. The court finds that the video does not conclusively contradict Wright's account, and, therefore, there remains a genuine issue of material fact as to whether Wright was denied an opportunity to decontaminate himself.

In light of the differing accounts of the facts leading up to Defendant's use of force and afterwards in regard to whether Defendant denied Wright the opportunity to clean off the chemical munitions, the court is unable to grant Defendant summary judgment on the basis of qualified immunity. *See Hinojos v. Bowers*, No. 2:14-cv-1800-DCN, 2015 WL 4878812, *8 (D.S.C. Aug. 14, 2015) (citations omitted) ("[T]he court holds that there is a genuine issue of material fact as to whether [the defendant] used excessive force against [plaintiff]; therefore, the court cannot determine at the summary judgment phase that [the defendant's] actions were objectively reasonable for purposes of granting qualified immunity.").

## IV. Conclusion

After a thorough review of the Report and the record in this case, the court declines to adopt the Magistrate Judge's Report (ECF No. 83). Instead, for the reasons stated herein, the court **DENIES** Defendant's Motion for Summary Judgment (ECF No. 75).

**IT IS SO ORDERED.**

s/Timothy M. Cain
United States District Judge

Anderson, South Carolina
June 18, 2019


**NOTICE OF RIGHT TO APPEAL**

The parties are hereby notified of the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.